[No. 14599. Department Two. April 4, 1918.]

THERON T. BARBOUR *et al., Respondents,* v. ST. PAUL FIRE & MARINE INSURANCE COMPANY, *Appellant.*[1]

INSURANCE—FIRE POLICIES — EXAMINATION UNDER OATH—SIGNING. An appearance before a notary and submitting to an examination under oath is a substantial compliance with the provision of an insurance policy requiring the insured to submit to examination under oath and subscribe the same, although the original copy of the examination was not signed.

SAME — ACTIONS — "SUSTAINABLE" — CONDITION PRECEDENT—COMPLIANCE WITH CONDITIONS. A policy of insurance providing that no action shall be "sustainable" until after full compliance with all its requirements does not require full compliance before the action is commenced, but is satisfied by compliance at the time of trial.

SAME—POLICY—CANCELLATION—EVIDENCE—SUFFICIENCY. The evidence is insufficient to show the cancellation of a fire insurance policy by mutual consent where the company required that a receipt be signed before the policy was cancelled, and although the insured intended to cancel the policy, she refused to sign the receipt when tendered, and nothing further was done until after the loss.

Appeal from a judgment of the superior court for Snohomish county, Alston, J., entered May 11, 1917, upon the verdict of a jury rendered in favor of the plaintiffs, by direction of the court, in an action upon a fire insurance policy. Affirmed.

*H. T. Granger,* for appellant.
*J. W. Russell,* for respondents.

CHADWICK, J.—This is an action on a policy of insurance brought by Theron T. Barbour and Mary Barbour, his wife, against the St. Paul Fire & Marine Insurance Company. At the close of the evidence, the trial judge instructed the jury to return a verdict in favor of the plaintiffs. The defendant insurance company has appealed.

[1]Reported in 171 Pac. 1030.

Appellant contends:   (1) That plaintiffs did not comply with the provisions of the policy requiring the insured, if requested by the company, to submit to an examination under oath and subscribe the same, which is made a condition precedent to sustaining an action on the policy; (2) that the policy was cancelled by mutual consent prior to the time the loss occurred.

The policy provided:

"The insured, as often as required, shall  .  .  . submit to examinations under oath by any person named by this company, and subscribe the same."

"No suit or action on this policy for the recovery of any claim, shall be *sustainable* in any court of law or equity until after full compliance by the insured with all the foregoing requirements,  .  .  ." [Italics ours.]

At the request of the insurance company, Mrs. Barbour appeared before a notary public and was examined under oath by the attorney for appellant. She was given a carbon copy of her testimony to correct before signing. She did not sign the original copy of the examination until after the present action had been commenced, the examination being introduced in evidence by appellant.

When Mrs. Barbour appeared before the notary public and submitted to an examination under oath, there was a substantial compliance with this provision of the policy. The insurance company had obtained the information which it was designed to secure. The signing of the written result of the examination was a purely incidental matter.

But even if this were not so, when we look to the words of the policy, which it is well settled must be strictly construed against the insurance company, we do not find that it provides that no action shall be "commenced" but that no action shall be "sustainable." At the time plaintiffs sought to sustain their

action by proofs, the examination had been signed and was in the hands of the defendant. All that the policy required had been performed.

To decide whether or not the policy was cancelled by mutual consent prior to the time of the loss, requires a discussion of the facts. The plaintiffs were the owners of a house and lot in Edmonds, Washington. The house and its contents were insured in the Orient Insurance Company for $1,900. The property was mortgaged; and the policy, which was payable to the mortgagee as its interest might appear, was in the possession of the mortgagee. In August, 1915, about the time the policy was due to expire, Mr. Barbour called on the insurance agent, Rudolph Damus, in Seattle, through whom he had obtained the insurance, and told him that he wanted it renewed without, however, specifying any particular company. Mr. Damus told him that he would attend to the matter.

Damus, who was not the agent of the defendant company, and in this instance was acting as a broker, ordered the insurance from the defendant's local agent. The policy was issued and delivered to Damus, or his office, but never reached the plaintiffs, probably, as the record suggests, being lost in the mail.

About the first of the following September, Mr. Barbour received a statement of his account from the mortgagee, which statement included an item of $22.80 for an insurance premium. He testifies that he supposed this was the premium on the policy he had ordered through Damus. In July, 1916, nearly a year later, while Mr. Barbour was in British Columbia, Mrs. Barbour received a notice from Damus to the effect that $22.80 was due him as a premium on insurance. She immediately investigated, and found that the policy secured by Damus was not the one covered by the statement sent by the mortgagee, and that the

mortgagee had secured insurance in the same amount, $1,900, on the property in the Continental Insurance Company.

She took the matter up with Mr. Damus, and he advised her that one policy would have to be cancelled, and suggested that it had better be the policy last issued. This was ascertained to be the policy on which this suit is brought. She then told Damus that "theirs (the policy secured by the mortgagee) was first and we would have to cancel the other one."

Damus then took the matter up with the local agent of the defendant, and according to the testimony of the agent, the following is what took place:

"He came down to the office and told me that they had other insurance on there. I asked him what company it was and he said 'Why, the Continental was one.' I said 'Well, that is funny,' and he said 'What are you going to do ' He told me the premium had not been paid. I said 'The only way to do, then, is to make out a receipt for the earned premium and get it and have the company sign it,' and I was pretty busy at the time and he said 'You wait a while and I will bring it up to you.' He said 'They are up there in the office now,' and I said 'All right, if that is the case I will get rid of it right now,' and I went and figured out the earned premium on the receipt and Mr. Damus was sitting right by the side of the desk when that was made, and I said 'There it is now; you can go right up and have your party sign it up.' "

The receipt was in the following form:

"LOST POLICY RECEIPT.

"St. Paul Fire & Marine Insurance Company of St. Paul.

"RELEASE FOR LOST POLICY.

"In consideration of 14.25 Dollars, the receipt of which is hereby acknowledged we surrender, release and relinquish all our right, title and interest in Policy No. 356369 (Renewal No. ......), of the St. Paul Fire & Marine Insurance Company of St. Paul, Minn., is-

sued at its Seattle, Wash., agency, and all advantages to be derived therefrom, and the said policy having been lost or mislaid, we agree to make no claim whatever for any loss or damage for which said company might become liable under said policy, and to return the said policy and renewal (if found) to the said company forthwith, and without further compensation. We hereby certify that said policy has not been assigned or transferred.    ,...................
Witness:.................    ....................

"If this policy is payable in case of loss, this receipt must be signed by assured, mortgagee or other parties in interest."

When Damus presented this receipt to Mrs. Barbour for her signature, she refused to sign it, and nothing further was done about the matter until after the loss occurred. Plaintiffs made claims against both the Continental Insurance Company and the defendant. The Continental settled; and the defendant refusing to do so, this suit was instituted.

It is clear, as appellant contends, that the plaintiffs never intended to carry more than $1,900 worth of insurance; and if they are permitted to recover in this action, they will reap where they did not intend to sow. But it is also clear that they intended to order the policy which Damus secured from the defendant. Assuming, but not deciding, that Mrs. Barbour had authority to order a cancellation of the policy, we do not think the policy was actually cancelled. It is plain that she intended to cancel the policy and that the insurance company was willing to do so. But before the insurance company would actually cancel the policy, it required that a receipt be signed. This receipt was not signed, and as nothing further was done, the policy remained in full force and effect.

In order to effect the cancellation of a policy, there must be something more than a willingness on both sides that the policy be cancelled; there must be an

actual agreement or understanding to the effect that the policy is then and there cancelled. That this was not so in the present case is clear.

Affirmed.

ELLIS, C. J., MOUNT, MAIN, and HOLCOMB, JJ., concur.